UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| CARL WEST, | ) | 1:06CV1277 |
| | ) | |
| Petitioner | ) | JUDGE DONALD NUGENT |
| | ) | (Magistrate Judge Kenneth S. McHargh) |
| v. | ) | |
| | ) | |
| STUART HUDSON, | ) | |
| Warden, | ) | |
| | ) | |
| Respondent | ) | REPORT AND RECOMMENDED |
| | ) | DECISION OF MAGISTRATE JUDGE |

McHARGH, MAG. J.

The petitioner Carl West ("West") has filed a petition pro se for a writ of habeas corpus arising out of his 2003 conviction for kidnapping, aggravated burglary, aggravated robbery, each with a firearm specification, and carrying a concealed weapon, in the Cuyahoga County, Ohio, Court of Common Pleas.  (Doc. 1.) West raises eight grounds for relief in his petition:

> 1.  The court committed reversible error when it refused to sever the trial of the co-defendants, in violation of the Bruton line of cases.
>
> 2.  Appellant was denied a fair trial by the FBI Agent's improper comments while testifying.
>
> 3.  The trial court erred when it continuously allowed the state to introduce hearsay testimony, in violation of the Ohio Rules of Evidence, Rule 802, thus denying Petitioner his right to a fair trial.
>
> 4.  The trial court erred in denying Petitioner's motion for acquittal as to the charges when the state failed to present sufficient evidence that Petitioner committed these offenses.

5. Petitioner's convictions are against the manifest weight of the evidence.

6. The trial court erred when it refused defense counsel the right to cross-examine a key identification witness on material inconsistencies in her written statement.

7. The trial court erred by refusing to order the county prosecutor and/or DEA to turn over a statement of a key witness of the state, thus denying Petitioner his right to confrontation under the Ohio Constitution and the U.S. Constitution, thus denying Petitioner his right to a fair trial.

8. Petitioner was denied effective assistance of counsel as guaranteed by Section 10, Article I, of the Ohio Constitution and the Sixth and Fourteenth Amendments to the United States Constitution when counsel failed to file a motion to suppress.

(Doc. 1, at §§ 12.A.-12.H.)

The respondent argues that all eight grounds have been procedurally defaulted. (Doc. 11, at 10.)

## I. FACTUAL AND PROCEDURAL BACKGROUND

The Ohio Court of Appeals set forth the following factual background:

The facts relevant to this appeal have been set out in the companion case of State v. Pinchback (), Cuyahoga App. No. 83757, and need not be repeated in its entirety herein. However, we note the following facts relevant to defendant's appeal: On June 16, 2003, defendant was indicted in a 12-count indictment for his conduct arising out of the events on June 9, 2003, to wit: two counts of conspiracy to commit aggravated murder, two counts of kidnapping, two counts of aggravated burglary, two counts of aggravated robbery, two counts of felonious assault, one count of failure to comply with the order or signal of a police officer, and one count of carrying a concealed weapon. On September 16, 2003, the jury returned guilty verdicts on two counts of aggravated burglary, two counts of aggravated robbery, one count of kidnapping (all with firearm specifications), and one count of carrying

    a concealed weapon. Defendant was acquitted of the remaining charges. He received a total sentence of seven years for these convictions.

(Doc. 11, RX 8; State v. West, No. 83779, 2004 WL 2340180, at *1 (Ohio Ct. App. Sept. 30, 2004.))  As set forth in Pinchback, the additional factual background is as follows:

    [Pinchback]'s convictions stem from an incident that occurred on June 9, 2003. The incident had been precipitated by an earlier event: in late May, Richard Horvath III, known by his nickname "Li'l Ritchie" to distinguish him from his father Richard Horvath Senior, had stolen a suitcase full of money from his long-time friend, an alleged drug-dealer named Jarrett Doss.

    Li'l Ritchie had taken the money for several reasons. Although he had known Doss since they attended junior high school in Virginia together, and Doss was sheltering him in the spring of 2003, Li'l Ritchie in December 2002 had spoken to a federal Drug Enforcement Agency ("DEA") representative in Virginia about Doss' illegal activities; he realized Doss was suspicious of him and that he was in danger if Doss discovered the betrayal. L'il Ritchie's family members were persons of limited means. Additionally, when the opportunity to steal the money presented itself, he could not resist the temptation.

    He fled with the money from Atlanta, where he had been staying with Doss, to Cleveland, where his father and aunt, Crystal Szell, lived. Upon his arrival in this area, he began a spending spree. The spree extended to his friends and family. With their help, Li'l Ritchie purchased a Mercedes-Benz automobile; he also gave his father enough cash to purchase a motorcycle and repaid a debt to Szell.

    His carelessness, however, attracted attention. Thus, Doss easily learned of it by contacting people in the Cleveland area whom he knew through Li'l Ritchie. One of these was Michael Saler who was close to the Horvath family: he had been working for Szell, and he was the brother of Terry Butcher, who for years had been Richard Horvath Senior's girlfriend.

    Doss' telephone contact with Saler was preceded by a frightening incident. On the evening of June 7, 2003, Saler was walking Butcher

from her apartment to his car when they were accosted from behind by several men. One of the men placed his arm around Saler's neck, and the "next thing [he knew], [he's] laying on the floor of a van with a gun shoved in [his] mouth." While Saler and Butcher were helpless, they were told by their assailants that "Ritch stole some money," that the men were "up here looking for him, and they [were] going to find him and anybody with him is going to get whacked."

Although the assailants quickly left, Saler received a telephone call from Doss the following morning. He agreed with Doss that, in exchange for his own and Butcher's safety, he would cooperate with Doss' men in their search for Li'l Ritchie. Saler was instructed to meet with Doss' men the next day at a motel near the airport.

Saler arrived at the motel at the appointed time on June 9, 2003 and proceeded to the room number he had been given. Once inside, he saw four men loading cartridges into guns. The men placed the guns into the waistbands of their pants before covering them with their shirts. Saler later identified the men as ... Quentin Pinchback and co-defendants Curtis Gregory, Carl West, and Rontae Perkins. Perkins seemed to have been the leader.

As ordered, Saler drove the men's van for them around the neighborhoods in which Li'l Ritchie could be found. He stopped once during the excursion, because Perkins stated they "needed some duct tape and some rope." After Perkins had obtained the items, Richard Horvath Senior passed the van in the opposite direction. Li'l Ritchie's father was known to Doss' men, so sighting him lent credence to Saler's cooperation. Saler returned the men to the motel, but was told to come back in two hours.

At approximately 4:00 p.m., while Saler remained seated in his car in the motel parking lot, the van stopped, and the men exited it to speak with him. Perkins informed him the "plan" was to "get into [Szell's] house," so they could "tie up" Szell and force Li'l Ritchie to come there. Saler indicated he would have no trouble gaining admission, since he and Szell were friends. He told the men to follow him to her condominium.

Upon their arrival in the neighborhood, the men waited in the van while Saler entered Szell's home to "scout" the situation. Szell admitted Saler, but told him she and her daughter, fourteen-year old

4

"T," were leaving soon to eat out. Thus, after a short visit, Saler left when they did.

Saler immediately met with Doss' men in a nearby parking lot to tell them Szell's home currently was empty and where she kept a spare key. Perkins decided to take advantage of this development; he instructed Saler to drive the van, drop them off at Szell's, then return for them upon his signal. Saler obeyed.

After a time, Szell arrived back at her home to retrieve some videotapes she wanted to return. T volunteered to go inside for them while Szell waited in the car.

T entered through the garage to find the hallway strewn with papers and clothing. Unsettled, she looked into the laundry room and there she saw a man she later identified as [Pinchback]. He stood against the dryer, arms crossed, with a gun in one of his hands. [Pinchback] glanced in her direction; when his eyes met with T's, she fled out the garage door.

T ran into the driveway screaming, "They have guns!" Szell had heard the screams and had exited the car, but she remained unsure of what was occurring, so she simply stood in the driveway while T continued her flight to a neighbor's nearby condominium to telephone the police. Thus, Szell was in a position to see when two men ran out of her home. She later identified the men as [Pinchback] and his co-defendant Carl West.

Seeing Szell, West pointed the gun he carried wrapped in a white towel at her, pushed it into her stomach, and ordered her to get inside. Szell put her hands up and began backing away from the weapon. T observed this from the window of the neighbor's; T further saw [Pinchback] glancing around as if searching for her, so she ducked out of sight.

Saler had by this time received the summons to return for Doss' men. He approached Szell's home to see the men running toward the van "from everywhere." When he came near, one jumped into the rear passenger seat while the other opened the sliding door; [Pinchback] and West also leapt inside. Saler was urged to "go, go, go." As he pulled away, he saw Szell, obviously agitated, standing in her driveway with her cellular telephone in hand.

>Saler's subsequent efforts to elude the police proved futile. Within a short time, he was forced to stop the van, and, although all the men inside attempted to flee on foot, all were captured.
>
>Within a week, [Pinchback], Perkins, West, Gregory, and Saler were together indicted on a total of twenty counts. * * * * *
>
>Saler eventually entered into a plea agreement with the state and testified as a prosecution witness at the jury trial of his co-defendants. Among many others, the state additionally presented as witnesses the Horvaths, Szell, T, Butcher, some of the police officers involved, and an agent of the Federal Bureau of Investigation ("FBI").

State v. Pinchback, No. 83757, 2004 WL 1902714, at *1-*3 (Ohio Ct. App. Aug. 26, 2004.))

On Nov. 14, 2003, West filed a timely appeal, raising eight assignments of error, as follows:

>1. The court committed reversible error when it refused to sever the trials of the co-defendants in violation of the Bruton line of cases.
>
>2. Appellant was denied a fair trial by the FBI agent's improper comments while testifying.
>
>3. The trial court erred when it continuously allowed the State to introduce hearsay testimony in violation of Evidence Rule 802, thus denying Appellant his right to a fair trial.
>
>4. The trial court erred in denying Appellant's motion for acquittal as to the charges when the State failed to present sufficient evidence that Appellant committed these crimes.
>
>5. Appellant's convictions are against the manifest weight of the evidence.
>
>6. The trial court [erred] when it refused defense counsel the right to cross-examine a key identification witness on material inconsistencies in her written statement.

6

> 7. The trial court erred by refusing to order the county prosecutor and/or the DEA to turn over a statement of a key witness of the State, thus denying Appellant of his right to confrontation under the Ohio Constitution and the U.S. Constitution, thus denying Appellant his right to a fair trial.
>
> 8. Appellant was denied effective assistance of counsel as guaranteed by Section 10, Article 1, of the Ohio Constitution and the Sixth and Fourteenth Amendments to the United States Constitution when counsel failed to file a motion to suppress.

(Doc. 11, RX 6.) On Sept. 30, 2004, the court of appeals affirmed his conviction. (Doc. 11, RX 8; State v. West, No. 83779, 2004 WL 2340180 (Ohio Ct. App. Sept. 30, 2004).) West's motion for reconsideration was denied. (Doc. 11, RX 9-11.)

West filed a motion for leave to file a delayed appeal with the Ohio Supreme Court on Jan. 7, 2005, which was denied. (Doc. 11, RX 12-13.) Likewise, West's second motion to file a delayed appeal with the state high court was denied. (Doc. 11, RX 15-17.)

West filed this petition for a writ of habeas corpus on May 23, 2006. (Doc. 1.)

## II. HABEAS CORPUS REVIEW

This case is governed by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), 28 U.S.C. § 2254, which provides the standard of review that federal courts must apply when considering applications for a writ of habeas corpus. Under the AEDPA, federal courts have limited power to issue a writ of habeas corpus with respect to any claim which was adjudicated on the merits by a state court. The Supreme Court, in Williams v. Taylor, provided the following guidance:

7

> Under § 2254(d)(1), the writ may issue only if one of the following two conditions is satisfied -- the state-court adjudication resulted in a decision that (1) "was contrary to ... clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "involved an unreasonable application of ... clearly established Federal law, as determined by the Supreme Court of the United States." Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts.  Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

Williams v. Taylor, 529 U.S. 362, 412-13 (2002).  See also Lorraine v. Coyle, 291 F.3d 416, 421-422 (6th Cir. 2002), cert. denied, 538 U.S. 947 (2003).

A state court decision is "contrary to" clearly established Supreme Court precedent "if the state court applies a rule that contradicts the governing law set forth in [Supreme Court] cases."  Williams, 529 U.S. at 405.  See also Price v. Vincent, 538 U.S. 634, 640 (2003).

A state court decision is not unreasonable simply because the federal court considers the state decision to be erroneous or incorrect.  Rather, the federal court must determine that the state court decision is an objectively unreasonable application of federal law.  Williams, 529 U.S. at 410-12; Lorraine, 291 F.3d at 422.

West has filed his petition pro se.  The pleadings of a petition drafted by a pro se litigant are held to less stringent standards than formal pleadings drafted by lawyers, and will be liberally construed.  Urbina v. Thoms, 270 F.3d 292, 295 (6th Cir. 2001) (citing Cruz v. Beto, 405 U.S. 319 (1972); Haines v. Kerner, 404 U.S. 519

8

(1972) (per curiam)).  Other than that, no special treatment is afforded litigants who decide to proceed pro se.  McNeil v. United States, 508 U.S. 106, 113 (1993) (strict adherence to procedural requirements); Jourdan v. Jabe, 951 F.2d 108 (6th Cir. 1991); Brock v. Hendershott, 840 F.2d 339, 343 (6th Cir. 1988).

Several of the grounds put forward by West allege violations of the Ohio Constitution.  The question before this federal habeas court is whether the state court decision was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States.  Federal habeas relief is not available for a claimed violation of state law, thus any alleged violation of the Ohio Constitution is not properly before this court.  See Lewis v. Jeffers, 497 U.S. 764, 780 (1990).

### III.  PROCEDURAL DEFAULT

A habeas petitioner cannot obtain relief unless he has completely exhausted his available state remedies.  Coleman v. Thompson, 501 U.S. 722, 731 (1991); Buell v. Mitchell, 274 F.3d 337, 349 (6th Cir. 2001) (citing Coleman v. Mitchell, 244 F.3d 533, 538 (6th Cir.), cert. denied, 534 U.S. 977 (2001)).  The exhaustion requirement is satisfied when the highest court in the state has been given a full and fair opportunity to rule on the petitioner's claims.  Rust v. Zent, 17 F.3d 155, 160 (6th Cir. 1994) (citing Manning v. Alexander, 912 F.2d 878, 881 (6th Cir. 1990)).  A petitioner cannot circumvent the exhaustion requirement by failing to comply with state procedural rules.  Coleman, 501 U.S. at 731-732; Buell, 274 F.3d at 349.

The court considers four factors to determine whether a claim has been procedurally defaulted:  (1) the court must determine whether there is a state procedural rule that is applicable to the petitioner's claim, and whether the petitioner failed to comply with the rule; (2) the court must decide whether the state courts actually enforced the procedural sanction; (3) the court must decide whether the state procedural forfeiture is an adequate and independent state ground on which the state can rely to foreclose review of the federal claim; and, (4) the petitioner must demonstrate that there was cause for him not to follow the procedural rule, and that he was actually prejudiced by the alleged constitutional error.  Buell, 274 F.3d at 348 (citing Maupin v. Smith, 785 F.2d 135, 138 (6th Cir. 1986)); Jacobs v. Mohr, 265 F.3d 407, 417 (6th Cir. 2001) (quoting Maupin).

West did not file a timely appeal to the Ohio Supreme Court, and the court denied his motion for leave to file a delayed appeal.  (Doc. 11, RX 12-13.)  The Ohio Supreme Court's denial of a motion for leave to file a delayed appeal is a procedural ruling sufficient to bar habeas review.  Smith v. Ohio, Dept. of Rehab. and Corr., 463 F.3d 426, 431-432 (6th Cir. 2006); Bonilla v. Hurley, 370 F.3d 494, 497 (6th Cir. 2004) (per curiam), cert. denied, 543 U.S. 989 (2004).  Such a procedural default is "an adequate and independent ground on which the state can rely to foreclose review of his federal constitutional claims." Shabazz v. Ohio, 149 F.3d 1184, 1998 WL 384559, at *1 (6th Cir. June 18, 1998) (TABLE, text in WESTLAW).

When a petitioner has defaulted his federal claim in state court pursuant to an independent and adequate state procedural rule, habeas review is barred unless

10

the petitioner can demonstrate cause for the default and actual prejudice, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice. Bonilla, 370 F.3d at 497; Buell, 274 F.3d at 348.

West does not attempt to show cause and prejudice; instead, he argues that a failure to consider his habeas claims will result in a fundamental miscarriage of justice. (Doc. 16, at 1-2, 16.)

### A. Fundamental Miscarriage of Justice Exception

The fundamental miscarriage of justice exception applies only to a "narrow range of cases." Schlup v. Delo, 513 U.S. 298, 314-315 (1995) (quoting McCleskey v. Zant, 499 U.S. 467, 494 (1991)). The Supreme Court has instructed that the exception should remain "rare," applied only in the "extraordinary case." Id. at 321. The fundamental miscarriage of justice exception is explicitly linked to a showing of the petitioner's actual innocence. Id.

In this context, the Supreme Court stated that the meaning of actual innocence:

> . . . does not merely require a showing that a reasonable doubt exists in the light of the *new evidence*, but rather that no reasonable juror would have found the defendant guilty. It is not the district court's independent judgment as to whether reasonable doubt exists that the standard addresses; rather the standard requires the district court to make a probabilistic determination about what reasonable, properly instructed jurors would do. Thus, a petitioner does not meet the threshold requirement unless he persuades the district court that, in light of the *new evidence*, no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt.

Schlup, 513 U.S. at 329 (emphasis added). See, e.g., In re Byrd, 269 F.3d 561, 573-574 (6th Cir. 2001) (petitioner must show it's more likely than not that no reasonable juror would have convicted in light of new evidence); Taylor v. Mitchell, 296 F.Supp.2d 784, 796 (N.D. Ohio 2003).

Without new evidence of innocence, even the existence of a meritorious constitutional violation is not sufficient to establish the miscarriage of justice exception that would allow this habeas court to reach the merits of a procedurally defaulted claim. Souter v Jones, 395 F.3d 577, 589-90 (6th Cir. 2005) (citing Schlup, 513 U.S. at 316).

While West proposes several constitutional violations which he alleges occurred during his trial, he does not point to any evidence (new or old) of his actual innocence. See generally doc. 16. West has not persuaded this court that his case is that rare, extraordinary case in which the miscarriage of justice exception should apply to excuse his procedural default.

## IV. SUMMARY

The petition should be denied because West's claims have been procedurally defaulted.

## RECOMMENDATION

It is recommended that the petition be denied.


Dated:  Aug. 28, 2007            /s/ Kenneth S. McHargh
                                 Kenneth S. McHargh
                                 United States Magistrate Judge

ANY OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Courts within ten (10) days of receipt of this notice.  Failure to file objections within the specified time WAIVES the right to appeal the District Court's order.  See Thomas v. Arn, 474 U.S. 140 (1985); United States v. Walters, 638 F.2d 947 (6th Cir. 1981).