# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF OHIO
# EASTERN DIVISION

| | |
|---|---|
| **CARL WEST,** | ) CASE NO. 1:06 CV 1277 |
| Petitioner, | ) |
| v. | ) **JUDGE DONALD C. NUGENT** |
| **STUART HUDSON, Warden,** | ) **Magistrate Judge Kenneth S. McHargh** |
| Respondent. | ) <u>**MEMORANDUM OPINION**</u> |

This matter comes before the Court upon the Report and Recommendation of Magistrate Judge Kenneth S. McHargh. The Report and Recommendation (Document #17) is ADOPTED by this Court and Petitioner's Petition for Habeas Corpus pursuant to 28 U.S.C. § 2254 (Document #1) is DENIED.

The factual and procedural history of this case, as set forth by the Magistrate Judge, is as follows:

> The Ohio Court of Appeals set forth the following factual background:
>
> The facts relevant to this appeal have been set out in the companion case of State v. Pinchback, Cuyahoga App. No. 83757, and need not be repeated in its entirety herein. However, we note the following facts relevant to defendant's appeal: On June 16, 2003, defendant was indicted in a 12- count indictment for

> his conduct arising out of the events on June 9, 2003, to wit: two counts of conspiracy to commit aggravated murder, two counts of kidnapping, two counts of aggravated burglary, two counts of aggravated robbery, two counts of felonious assault, one count of failure to comply with the order or signal of a police officer, and one count of carrying a concealed weapon.
>
> On September 16, 2003, the jury returned guilty verdicts on two counts of aggravated burglary, two counts of aggravated robbery, one count of kidnapping (all with firearm specifications), and one count of carrying a concealed weapon. Defendant was acquitted of the remaining charges. He received a total sentence of seven years for these convictions.

(Doc. 11, RX 8; State v. West, No. 83779, 2004 WL 2340180, at *1 (Ohio Ct. App. Sept. 30, 2004.)) As set forth in Pinchback, the additional factual background is as follows:

> [Pinchback]'s convictions stem from an incident that occurred on June 9, 2003. The incident had been precipitated by an earlier event: in late May, Richard Horvath III, known by his nickname "Li'l Ritchie" to distinguish him from his father Richard Horvath Senior, had stolen a suitcase full of money from his long-time friend, an alleged drug-dealer named Jarrett Doss.
>
> Li'l Ritchie had taken the money for several reasons. Although he had known Doss since they attended junior high school in Virginia together, and Doss was sheltering him in the spring of 2003, Li'l Ritchie in December 2002 had spoken to a federal Drug Enforcement Agency ("DEA") representative in Virginia about Doss' illegal activities; he realized Doss was suspicious of him and that he was in danger if Doss discovered the betrayal. L'il Ritchie's family members were persons of limited means. Additionally, when the opportunity to steal the money presented itself, he could not resist the temptation.
>
> He fled with the money from Atlanta, where he had been staying with Doss, to Cleveland, where his father and aunt, Crystal Szell, lived.  Upon his arrival in this area, he began a spending spree. The spree extended to his friends and family. With their help, Li'l Ritchie purchased a Mercedes- Benz automobile; he also gave his father enough cash to purchase a motorcycle and repaid a debt to Szell.
>
> His carelessness, however, attracted attention. Thus, Doss easily learned of it by contacting people in the Cleveland area whom he knew through Li'l Ritchie. One of these was Michael Saler who was close to the Horvath family: he had been working for Szell, and he was the brother of Terry Butcher, who for years

-2-

had been Richard Horvath Senior's girlfriend.

Doss' telephone contact with Saler was preceded by a frightening incident. On the evening of June 7, 2003, Saler was walking Butcher from her apartment to his car when they were accosted from behind by several men. One of the men placed his arm around Saler's neck, and the "next thing [he knew], [he's] laying on the floor of a van with a gun shoved in [his] mouth." While Saler and Butcher were helpless, they were told by their assailants that "Ritch stole some money," that the men were "up here looking for him, and they [were] going to find him and anybody with him is going to get whacked."

Although the assailants quickly left, Saler received a telephone call from Doss the following morning. He agreed with Doss that, in exchange for his own and Butcher's safety, he would cooperate with Doss' men in their search for Li'l Ritchie. Saler was instructed to meet with Doss' men the next day at a motel near the airport.

Saler arrived at the motel at the appointed time on June 9, 2003 and proceeded to the room number he had been given. Once inside, he saw four men loading cartridges into guns. The men placed the guns into the waistbands of their pants before covering them with their shirts. Saler later identified the men as ... Quentin Pinchback and co-defendants Curtis Gregory, Carl West, and Rontae Perkins. Perkins seemed to have been the leader.

As ordered, Saler drove the men's van for them around the neighborhoods in which Li'l Ritchie could be found. He stopped once during the excursion, because Perkins stated they "needed some duct tape and some rope." After Perkins had obtained the items, Richard Horvath Senior passed the van in the opposite direction. Li'l Ritchie's father was known to Doss' men, so sighting him lent credence to Saler's cooperation. Saler returned the men to the motel, but was told to come back in two hours.

At approximately 4:00 p.m., while Saler remained seated in his car in the motel parking lot, the van stopped, and the men exited it to speak with him. Perkins informed him the "plan" was to "get into [Szell's] house," so they could "tie up" Szell and force Li'l Ritchie to come there. Saler indicated he would have no trouble gaining admission, since he and Szell were friends. He told the men to follow him to her condominium.

Upon their arrival in the neighborhood, the men waited in the van while Saler entered Szell's home to "scout" the situation. Szell admitted Saler, but told him she and her daughter, fourteen- year old "T," were leaving soon to eat out. Thus, after a short visit, Saler left when they did.  Saler immediately met with

-3-

Doss' men in a nearby parking lot to tell them Szell's home currently was empty and where she kept a spare key. Perkins decided to take advantage of this development; he instructed Saler to drive the van, drop them off at Szell's, then return for them upon his signal. Saler obeyed.

After a time, Szell arrived back at her home to retrieve some videotapes she wanted to return. T volunteered to go inside for them while Szell waited in the car.

T entered through the garage to find the hallway strewn with papers and clothing. Unsettled, she looked into the laundry room and there she saw a man she later identified as [Pinchback]. He stood against the dryer, arms crossed, with a gun in one of his hands. [Pinchback] glanced in her direction; when his eyes met with T's, she fled out the garage door.

T ran into the driveway screaming, "They have guns!" Szell had heard the screams and had exited the car, but she remained unsure of what was occurring, so she simply stood in the driveway while T continued her flight to a neighbor's nearby condominium to telephone the police. Thus, Szell was in a position to see when two men ran out of her home. She later identified the men as [Pinchback] and his co-defendant CarlWest.

Seeing Szell, West pointed the gun he carried wrapped in a white towel at her, pushed it into her stomach, and ordered her to get inside. Szell put her hands up and began backing away from the weapon. T observed this from the window of the neighbor's; T further saw [Pinchback] glancing around as if searching for her, so she ducked out of sight.

Saler had by this time received the summons to return for Doss' men.  He approached Szell's home to see the men running toward the van "from everywhere." When he came near, one jumped into the rear passenger seat while the other opened the sliding door; [Pinchback] and West also leapt inside. Saler was urged to "go, go, go." As he pulled away, he saw Szell, obviously agitated, standing in her driveway with her cellular telephone in hand.

Saler's subsequent efforts to elude the police proved futile. Within ashort time, he was forced to stop the van, and, although all the men inside attempted to flee on foot, all were captured.

Within a week, [Pinchback], Perkins, West, Gregory, and Saler were together indicted on a total of twenty counts. * * * * *

>> Saler eventually entered into a plea agreement with the state and testified as a prosecution witness at the jury trial of his co-defendants. Among many others, the state additionally presented as witnesses the Horvaths, Szell, T, Butcher, some of the police officers involved, and an agent of the Federal Bureau of Investigation ("FBI").

State v. Pinchback, No. 83757, 2004 WL 1902714, at *1-*3 (Ohio Ct. App. Aug. 26, 2004.))

On Nov. 14, 2003, West filed a timely appeal, raising eight assignments of error, as follows:

> 1. The court committed reversible error when it refused to sever the trials of the co-defendants in violation of the Bruton line of cases.
>
> 2. Appellant was denied a fair trial by the FBI agent's improper comments while testifying.
>
> 3. The trial court erred when it continuously allowed the State to introduce hearsay testimony in violation of Evidence Rule 802, thus denying Appellant his right to a fair trial.
>
> 4. The trial court erred in denying Appellant's motion for acquittal as to the charges when the State failed to present sufficient evidence that Appellant committed these crimes.
>
> 5. Appellant's convictions are against the manifest weight of the evidence.
>
> 6. The trial court [erred] when it refused defense counsel the right to cross-examine a key identification witness on material inconsistencies in her written statement.
>
> 7. The trial court erred by refusing to order the county prosecutor and/or the DEA to turn over a statement of a key witness of the State, thus denying Appellant of his right to confrontation under the Ohio Constitution and the U.S. Constitution, thus denying Appellant his right to a fair trial.
>
> 8. Appellant was denied effective assistance of counsel as guaranteed by Section 10, Article 1, of the Ohio Constitution and the Sixth and Fourteenth Amendments to the United States Constitution when counsel failed to file a motion to suppress.

(Doc. 11, RX 6.) On Sept. 30, 2004, the court of appeals affirmed his conviction. (Doc. 11, RX 8; State v. West, No. 83779, 2004 WL 2340180 (Ohio Ct. App. Sept. 30, 2004).) West's motion for reconsideration was denied. (Doc. 11, RX 9-11.)

West filed a motion for leave to file a delayed appeal with the Ohio Supreme Court on Jan. 7, 2005, which was denied. (Doc. 11, RX 12-13.) Likewise, West's second motion to file a delayed appeal with the state high court was denied. (Doc. 11, RX 15-17.)

Petitioner filed this petition for a writ of habeas corpus on May 23, 2006. (Document #1.)

Petitioner raises eight grounds for relief in his petition.

1. The court committed reversible error when it refused to sever the trial of the co-defendants, in violation of the Bruton line of cases.

2. Appellant was denied a fair trial by the FBI Agent's improper comments while testifying.

3. The trial court erred when it continuously allowed the state to introduce hearsay testimony, in violation of the Ohio Rules of Evidence, Rule 802, thus denying Petitioner his right to a fair trial.

4. The trial court erred in denying Petitioner's motion for acquittal as to the charges when the state failed to present sufficient evidence that Petitioner committed these offenses.

5. Petitioner's convictions are against the manifest weight of the evidence.

6. The trial court erred when it refused defense counsel the right to cross-examine a key identification witness on material inconsistencies in her written statement.

7. The trial court erred by refusing to order the county prosecutor and/or DEA to turn over a statement of a key witness of the state, thus denying Petitioner his right to confrontation under the Ohio Constitution and the U.S. Constitution, thus denying Petitioner his right to a fair trial.

8. Petitioner was denied effective assistance of counsel as guaranteed by Section 10, Article I, of the Ohio Constitution and the Sixth and Fourteenth Amendments to the United States Constitution when counsel failed to file a motion to suppress.
(Doc. 1, at §§ 12.A.-12.H.)

Respondent filed an Answer/Return of Writ on September 18, 2006 (Docket #11). Petitioner filed a Traverse on December 20, 2006. (Docket #16).

On August 28, 2007, the Magistrate Judge issued a Report and Recommendation. (Docket #17.) Because Petitioner did not file a timely appeal to the Ohio Supreme Court, and the Ohio Supreme Court denied his motions for leave to file a delayed appeal, Petitioner is procedurally barred from obtaining a review in this Court. The Magistrate Judge found that Petitioner failed to support his argument that the failure to address his habeas claims will result in a fundamental miscarriage of justice. Specifically, the Magistrate Judge stated, "Petitioner has not persuaded this court that his case is that rare, extraordinary case in which the miscarriage of justice exception should apply to excuse his procedural default. *See Bonilla v. Hurley*, 370 F.3d 494, 497 (6th Cir. 2004); *Buell v. Mitchell*, 274 F3d 337, 348 (6th Cir. 2001). Accordingly, the Magistrate Judge recommends that the Petition be denied, as Petitioner's claims have been procedurally defaulted.

On September 19, 2007, Petitioner filed his Objections to the Magistrate Judge's Report and Recommendation. (Docket #20.) Petitioner now argues that "he can clearly show both cause and prejudice for filing a delayed appeal in the Ohio Supreme Court." Petitioner argues that the fact that he did not have an attorney "caused" his appeal to the Ohio Supreme Court to be untimely. Petitioner states that he is prejudiced by being "imprisoned unlawfully in violation of the United States Constitution." No Response was filed to Petitioner's Objections.

**Standard of Review for a Magistrate Judge's Report and Recommendation**

The applicable district court standard of review for a magistrate judge's report and recommendation depends upon whether objections were made to the report. When objections are

made to a report and recommendation of a magistrate judge, the district court reviews the case *de novo.*  FED. R. CIV. P. 72(b) provides:

> The district judge to whom the case is assigned shall make a de novo determination upon the record, or after additional evidence, of any portion of the magistrate judge's disposition to which specific written objection has been made in accordance with this rule.  The district judge may accept, reject, or modify the recommended decision, receive further evidence, or recommit the matter to the magistrate judge with instructions.

The Court has reviewed the Report and Recommendation *de novo*, as well as the briefs and supporting material submitted by the Parties, and the objections to the Report and Recommendation raised by Petitioner, and finds the Report and Recommendation to be well-reasoned and correct.  The Court agrees with, and adopts, the findings and conclusions of Magistrate Judge McHargh as its own.

Further, the Court notes that it has reviewed the "cause and prejudice" argument raised in Petitioner's Objections to the Magistrate Judge's Report and Recommendation and finds it to be without merit.  The Supreme Court of Ohio rejected two separate attempts by Petitioner to file a delayed appeal.  In his first motion for leave to file a delayed appeal, Petitioner argued that his filing of a motion for reconsideration and his inability to compute the filing deadline caused his delay.  In his second motion for leave to file a delayed appeal, Petitioner argued that the delay in filing was caused by his inability to secure legal counsel and his lack of legal training.  In his Objections to the Report and Recommendation, Petitioner argues that the fact that he did not have an attorney caused his appeal to be untimely.  As set forth above, the Supreme Court of Ohio addressed this assertion as it was raised in Petitioner's second motion to file a delayed appeal.  None of  Petitioner's asserted reasons for failing to file his appeal before the deadline are sufficient to excuse a procedural default.  *See Bonilla v. Hurley*, 370 F.3d 494, 497-99 (6th Cir. 2004) (per curiam), *cert. denied*, 543 U.S. 989 (2004).  Accordingly,

Petitioner has procedurally defaulted on his claims.

Based on the foregoing, the Court hereby ADOPTS the Report and Recommendation of Magistrate Judge McHargh (Document #17) in its entirety; Petitioner's Petition for Habeas Corpus is DENIED.

Further, the Court certifies, pursuant to 28 U.S.C. § 1915(a)(3), that an appeal from this decision could not be taken in good faith, and there is no basis upon which to issue a certificate of appealability.  28 U.S.C. § 2253(c); FED. R. APP. P. 22(b).

IT IS SO ORDERED.

                                                  s/Donald C. Nugent
                                                  DONALD C. NUGENT
                                                  United States District Judge

DATED: October 15, 2007